Filed 7/3/24  P. v. Garcia CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HUGO CESAR GARCIA,<br><br>    Defendant and Appellant. | E079586<br><br>(Super.Ct.No. RIF1900810)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Judge. (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Minh U. Le, Deputy Attorney Generals, for Plaintiff and Respondent.

1

Defendant and appellant Hugo Cesar Garcia got involved in an altercation with security guards at the Dukes Bar and Grill restaurant and nightclub in Riverside (Dukes). During the altercation, defendant stabbed two of the security guards and, while on the ground being held by the security guards, reached into his waistband and grabbed a gun. Defendant shot the gun one time but did not hit anyone. Defendant was convicted of two counts of attempted premeditated and deliberate murder, assault with a firearm, and simple assault against two of the security guards, Edward Daffron and Dennis Richards. He was convicted of assault with a semiautomatic firearm and assault with a deadly weapon, a knife, against Austin Daniels.

Defendant claims on appeal that (1) his conviction for attempted murder of Daffron is not supported by substantial evidence to support that he acted with the requisite intent to kill; (2) there was no evidence that the attempted murder of Daffron was committed willfully, deliberately, or with premeditation; (3) the jury's true finding that he personally and intentionally discharged a firearm in the commission of the attempted murder of Daffron is not supported by substantial evidence; (4) his conviction for assault with a semiautomatic firearm on Daniels is not support by substantial evidence; (5) his conviction for the attempted murder of Richards must be reversed because the evidence fails to establish that he acted with the requisite intent to kill; (6) there was no evidence that the attempted murder of Richards was committed willfully, deliberately, or with premeditation; (7) the trial court erroneously instructed the jury on premeditation (CALCRIM No. 601); (8) his conviction for the attempted murder of Daffron must be reversed as the jury was instructed on an inapplicable and legally

2

incorrect kill zone theory of liability (CALCRIM No. 600); (9) the trial court committed reversible error when it allowed officers to narrate the surveillance video and cellular telephone video taken at Dukes as their testimony constituted improper opinion evidence; and (10) this court should conduct an independent *Pitchess*[1] review of the records of several Riverside police officers who were involved in the investigation.

## FACTUAL AND PROCEDURAL HISTORY

### A.    PROCEDURAL HISTORY

Defendant was convicted of premeditated, deliberate and willful attempted murder (Penal Code, §§ 664, 187; count 5)[2]; and assault with a firearm (§ 245, subd. (b); count 6) against Daffron.  Defendant was convicted of premeditated, deliberate and willful attempted murder (§§ 664, 187; count 3) against Richards.  The jury found defendant not guilty of assault with a firearm (§ 245, subd. (b); count 4) against Richards but found him guilty of the lesser offense of simple assault.[3]  Against Daniels, he was convicted of assault with a semiautomatic firearm (§ 245, subd. (b); count 2) and assault with a deadly weapon, a knife (§ 245, subd. (a)(1); count 9).  He was convicted in count 7 of possession of a firearm having suffered a previous felony (§ 29800, subd. (a)(1)); and in count 8 with possession of ammunition by a felon (§ 30305, subd. (a)).

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Count 1 was dismissed pursuant to a section 995 motion.

3

In addition, the jury found true the allegation for count 2 that defendant personally used a firearm.  (§ 12022.5, subd. (a)).  They found for counts 3 and 5 that defendant acted with premeditation and deliberation and that he personally discharged a firearm within the meaning of section 12022.53, subdivision (c).  For count 3, the jury also found true that he personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury (§ 12022.7).  For count 6, the jury found true that defendant personally used a firearm (§ 12022.5, subd. (a)).  The jury found true that defendant personally inflicted great bodily injury (§ 12022.7) for count 9.[4]

Trial was bifurcated on the strike priors alleged against defendant.  Defendant admitted to having suffered a prior serious and violent felony conviction (§ 667, subds. (a), (c) & (e)(1), 1170.12, subd. (c)(1)).

Defendant was sentenced to state prison for a determinate sentence of 39 years plus 4 months, plus an indeterminate sentence of 28 years to life.

B.      FACTUAL HISTORY

1.      *TESTIMONY FROM DUKES'S EMPLOYEES*

In February 2019 Edward Daffron, who was six feet four inches tall. and weighed 260 pounds, was a manager at Dukes.  Dukes had a full restaurant, two bars and patios in the front and back.  Dukes had music and karaoke on the weekends and was usually open until 2:00 a.m.  Dukes had three entrances/exits and was normally staffed with four to

---

[4] The jury further found two aggravating factors to be true; the trial court found the third aggravating factor true, that defendant had served a prior prison term, after an admission by defendant.

five security guards. Security guards were not armed; they only carried flashlights. After 9:00 p.m., security guards performed "pat downs" on entering guests to ensure no guns or knives were brought into the premises. No smoking was allowed in Dukes. Any encounters with a patron in Dukes would occur with two security guards present.

On the night of February 16, 2019, Dennis Richards had been a security guard for two years at Dukes. Richards was monitoring the back patio. As he was watching the patio area, he saw defendant, who was standing in the parking lot of an adjacent gas station, looking over the wall into the patio. He tried to engage him in conversation but defendant did not respond. Defendant was chain-smoking cigarettes and had his hands in the pocket of a heavy jacket he was wearing. Defendant kept staring at a group of people on the patio and did not speak to Richards.

Richards decided to speak with Daffron to see if anything should be done about defendant. Daffron went outside to talk to defendant. He was accompanied by Keith Childress. Childress was six feet three inches tall and weighed 335 pounds.

Daffron asked defendant what he was doing but he did not respond. Defendant did not look well and Daffron asked him if he needed help. Defendant said he was fine. Daffron noticed that defendant kept his hands in the pocket of his jacket despite it being warm outside. Daffron believed, based on his experience, that defendant may have a gun in his pocket. Defendant warned Daffron to get the "fuck away from" him and not to get too close to him. Childress heard defendant tell them to back up and saw defendant reach for his waistband. Daffron and Childress decided to leave the area. Daffron advised Alicia Rieben, who was working at the adjacent gas station, to call the police to have

5

defendant removed. Daffron never yelled at defendant nor did he show any weapons to him.

Childress and Daffron returned to Dukes. Daffron told all of his security guards to keep an eye on defendant and went back inside Dukes. Daffron went to his office where he could see all of the surveillance cameras positioned inside and outside of Dukes.

As Daffron was watching the surveillance cameras, approximately five minutes after his encounter with defendant, he observed Richards run quickly from the back of Dukes to the front. Richards had heard a commotion at the front door and ran to help the other security guards.

Austin Daniels was another security guard who was on duty that night. He had been working at the front door when he observed defendant about two feet inside Dukes smoking a cigarette. Daniels advised him he could not smoke in the bar and had to take it outside to finish. Defendant told Daniels "get the fuck out of my face." Daniels asked him two additional times to take the cigarette outside. Defendant refused and Daniels grabbed the cigarette from defendant's hand and threw it outside. Daniels advised defendant that he was not welcome in Dukes and that he needed to leave. When defendant made no movement to leave, Daniels put his forearm on defendant's back to assist him in leaving. Defendant pushed back. Daniels pushed defendant outside of Dukes.

The jury was shown the video of the encounter between Daniels and defendant. Daniels described his actions in the video. Defendant could be seen standing at the threshold of Dukes smoking a cigarette. Daniels confronted him. Defendant just stared

6

at Daniels and did nothing to comply with him. Daniels grabbed the cigarette and threw it outside. Defendant could be seen with something in his hand. Daniels pushed defendant outside of Dukes.

Daniels followed defendant outside and defendant swung at him. Defendant had a knife in his hand and stabbed Daniels in the chest and leg. Defendant continued to struggle with Daniels as he pulled defendant out to the parking lot. The jury also was shown exhibit 5, which was a video depicting the walkway leading up to Dukes. Daniels described the video. Security guards could be seen at the end of the walkway checking identification and patting down patrons. Defendant could be seen walking by the security guards and approaching the front door. As he approached the front door, he lit his cigarette. A few moments later, Daniels could be seen pushing defendant down the walkway.

Another security guard, who did not testify, came to help Daniels. At this point, defendant was not being held and Daniels stood near him to make sure he was leaving the area. Defendant did not leave and was swinging his hand at whoever was close to him. The other security guard pushed defendant to the ground and defendant got back up. Richards arrived at this point and told defendant to leave but defendant reached into his pocket. Richards and Daniels believed that defendant had the opportunity at this point to just walk away but he refused.

Richards rushed at defendant. He grabbed his arms and tried to throw him on the ground. Defendant struck Richards in the back and on his neck with his fist. Richards did not realize that defendant was actually stabbing him with a knife. Richards was able

7

to pin defendant to the ground by getting on top of him. Defendant was facing the ground. Defendant then pulled a handgun from his waistband. Childress observed defendant pull the handgun from his waistband. Childress had also seen another gun fall from defendant during the struggle with Richards.

Daffron ran from his office to the front of Dukes. As Daffron got to the front, he could see two of his security guards wrestling with defendant. Daffron found a gun on the ground about four to five feet away from the altercation. He took the magazine out of the gun and threw it. He kept the gun.[5]

Defendant tried to push the gun toward Richards's face. Richards was able to move defendant's arm and pin it to the ground. Defendant then pulled the trigger but Richards was able to grab his wrist and direct the gun away from his face. Richards continued to pin defendant to the ground and could not reach the firearm. Defendant continued to struggle with Richards.

Daffron had observed defendant pull out the gun from his waistband. Defendant pointed it at Daffron from his location on the ground. Daffron grabbed defendant's hand and tried to peel his fingers from the gun. He also tried smashing defendant's hand down on the ground to get him to release the gun. Daffron had his hand on top of defendant's hand. He thought that defendant was trying to shoot him because he "pointed out towards my direction." Daffron's finger was caught behind the trigger of the gun. Defendant pulled the trigger and it snapped Daffron's finger in half. Daffron was able to

---

[5] Daniels testified that he found the handgun about one foot from defendant and that he gave it to Daffron.

push the gun away from himself just prior to it being fired by defendant. Daffron was finally able to get the gun away from defendant.

The jury was shown a cellular telephone video taken by one of the patrons at the bar. In the video, defendant could be seen standing near three security guards. Defendant was standing away from the three security guards. One of the security guards pushed defendant to the ground but defendant immediately stood back up and swung at them. He had a knife in his hand. Defendant was pinned on the ground, face down. Defendant lifted up his head, reached into his waistband and pulled the gun from his waistband.

Daniels was about four feet from defendant when the gun was fired. Richards remained on top of defendant until the police arrived. Richards was afraid to let defendant up after he had stabbed him and had fired a gun. Daffron hit defendant in the head three or four times. He was worried that defendant may have another gun and needed to subdue him. At this point, Daffron noticed that Daniels was bleeding from a knife wound to his leg. Daniels also discovered that he had been stabbed in the chest and leg.

Defendant never said anything during the altercation. Daffron put the guns and knife in his safe until police arrived. Daffron never observed Richards or Daniels hit defendant.

9

## 2. ADDITIONAL TESTIMONY

### a. Michael Dubski

Michael Dubski was present at Dukes that night. He and his brother were approaching the front door of Dukes when they observed one of the security guards advising a person in front of them that he could not go into Dukes. There was a verbal altercation and then it turned physical. The person and two security guards were wrestling around in the parking lot just past the entrance. About 30 seconds later, he heard a gunshot. Dubski saw something metal in defendant's hand but could not see what it was. Defendant did not retreat and held his hands up in a fighting manner. Another security guard showed up and was able to contain defendant. Dubski saw something get kicked away while defendant was being held on the ground. At trial he did not know what it was but told police officers that night that he thought it was a gun. Even when defendant was on the ground he did not appear to give up. Just before the gunshot, it appeared the security guards were all trying to grab his hands. Defendant was on the ground when the gunshot was heard.

Dubski indicated that prior to the gunshot, he had not seen anyone kick or strike defendant. He believed the security guards were just holding down defendant to contain him until police arrived and did not escalate the situation. Dubski did not see defendant backing away from the security guards.

### b. Alicia Rieben

Rieben was working as a cashier at the gas station adjacent to Dukes on the night in question. Rieben indicated oftentimes people stood at the wall separating the gas

station and Dukes, looking over the wall. On previous occasions, she had called Dukes to request a security guard ask the people to leave because she felt it was not safe to have persons lingering in the area.

When Rieben arrived at work on February 16, she did not park in her usual spot as defendant was standing in the area near his car. She did not feel comfortable getting out of her car near him. Defendant was looking over the wall into Dukes. She asked her coworker to go out and tell defendant to leave the premises. Defendant did not leave. At that point, two security guards from Dukes came to the parking lot and talked to defendant. It appeared that they were arguing. When they were done, the security guards came into the gas station and told Rieben to call the police because defendant was refusing to leave. While Rieben was on the phone with the police, she observed defendant walk toward the entrance to Dukes. A few moments later, she heard a gunshot. The police arrived quickly after she made the phone call. She never saw that defendant had a flat tire and he never asked for help.

### c. 911 Call

Public safety officer Michelle Jensen testified. She oversaw the 911 communication center for the Riverside Police Department. She testified that Daniel Tafesh called 911. Tafesh advised the dispatcher that police were needed at Dukes. He stated that "we almost died" when a customer tried to "shove his way in" and had two pistols on him. The customer shot the gun one time and had been contained. The handguns had been taken away. He reported someone had been "hit in the leg" and an ambulance was needed. Tafesh indicated that the customer was bleeding from his head.

11

### 3. *MEDICAL TREATMENT*

Daniels went to the hospital. Dr. Joseph Fargusson treated Daniels in the emergency room at Riverside Community Hospital. Daniels had two stab wounds. He had a one- and one-half-centimeter laceration to his upper stomach and a two-centimeter laceration to his right thigh. The stab wound to the upper stomach could have damaged his heart and other vital organs. He was admitted to the hospital to be monitored to make sure that no arteries were impacted by the stab wound to the chest. There were also concerns regarding a blood clot near his heart. Daniels received several stitches.

Dr. Rachael Tena was working in the emergency room that night and treated Richards. He had a laceration on his upper back. There was no puncture to the lung and no severing of important arteries. Several sutures were required in order to close the laceration. The wound would take several months to completely heal. He also had a wound to his neck, which could have impacted several arteries and been fatal.

Daffron's finger was broken after the altercation but he did not go to the hospital.

### 4. *POLICE INVESTIGATION*

Dubski spoke with Riverside Police Officer Brett McMillan at the scene. He told Officer McMillan that he observed a "tussle" between defendant and the security guards. The security guards took defendant to the ground. Dubski then saw an object fall to the ground that he identified as a handgun.

Officer McMillan also spoke with Childress, who stated he went with Daffron to speak with defendant when defendant was at the gas station. Defendant told them not to get too close to him. Childress observed a "tussle" between defendant and the security

12

guards. He saw a firearm fall out of defendant's waistband. He also observed defendant reach for his waistband and grab another gun. Childress told Officer McMillan that defendant pulled the trigger on the gun. Childress believed the gun was pointed at the ground when it was discharged. Childress thought Daniels may have been shot by a ricochet bullet.

From the scene, Officer McMillan recovered a Glock .23 handgun, a Glock .27 handgun, two magazines, and a folding knife. These were all in a bag in a safe inside Dukes. The two handguns were not registered.

Riverside Police Officer Matthew Chipukitea was dispatched to Dukes around midnight on February 16. A spent shell casing was found at the scene. Blood droplets and blood splatter were found on the walkway leading into Dukes. He photographed defendant at the hospital; he had two staples at the top of his head. Officer Chipukitea examined and photographed the two guns; a bullet was missing from one magazine and the other magazine was fully loaded. Defendant had two holsters for concealing guns on his person.

Riverside Police Officer Robert Karotz was dispatched to Dukes around midnight on February 16. When he arrived, the scene was chaotic. Persons were fleeing Dukes from emergency exits and running into the parking lot. Defendant was in handcuffs or being loaded into the ambulance. Officer Karotz spoke with Daffron. Daffron was agitated and emotional. Daffron provided Officer Karotz with access to the surveillance footage at Dukes. Officer Karotz watched the two videos provided by Daffron . He described it for the jury, as will be set forth in more detail, *post*.

13

Riverside Police Officer Taylor LaPoint arrived at Dukes shortly after midnight. When he arrived, other officers were holding down defendant. He assisted with detaining defendant. Officer LaPoint observed that defendant had a gun holster in his waistband. He took the holster from defendant. He spoke with Richards. He went to the hospital and took photographs of Richards's injuries. He had injuries to his back and neck. Richards's T-shirt and sweatshirt had holes that coincided with the knife wounds.

Riverside Police Officer Adriana Valenzuela also responded to Dukes. Officer Valenzuela secured the perimeter. A person approached Officer Valenzuela and stated that he or she had a video of the incident on their cellular telephone and did not want to be identified. Officer Valenzuela was played the video in court and described what was on the video, as will be set forth, *post.*

Riverside Police Detective Richard Glover was one of the first officers who arrived at the scene. There was chaos in the parking lot. He observed defendant on the ground and two individuals on top of him keeping him pinned to the ground. There was one person sitting on the curb. A fourth person was pacing back and forth nearby. The security guards told Detective Glover that defendant had shot at them and one of them was stabbed. He did not see the security guards hitting or punching defendant. Defendant was handcuffed and taken into custody. Detective Glover saw two gun holsters. One was near defendant and another was on his waistband. Defendant was searched and a loaded magazine was found in his pocket. The handguns recovered would have fit in the holsters. The handguns would expel a casing. The magazines that were

14

found fit the handguns in defendant's possession. The knife was a folding knife that had a two- and one-half-inch blade.

Riverside Police Officer Casey Adams arrived at Dukes shortly after midnight. He was the first officer to arrive. When he arrived, he observed two security guards on top of defendant attempting to hold him down. It appeared that defendant was trying to get up and was struggling. He did not observe any of the security guards using weapons against defendant. Officer Adams assisted the security guards in trying to control defendant's hands; he kept trying to put them under his body. Officer Adams was able to handcuff defendant. There was blood coming from a laceration on defendant's head and he was given medical attention.

The parties stipulated that defendant was prohibited from possessing a handgun. Defendant presented no evidence on his behalf.

## DISCUSSION

### A. COUNT 5: DAFFRON

Defendant makes three contentions as to the conviction for attempted premeditated and deliberate murder of Daffron. First, he claims that his conviction for attempted murder of Daffron is not supported by substantial evidence that he acted with the requisite intent to kill. He further contends there was no evidence that the attempted murder of Daffron was committed willfully, deliberately or with premeditation. Finally, he claims the jury's true finding that he personally and intentionally discharged a firearm in the commission of the attempted murder of Daffron is not supported by substantial evidence.

15

## 1. *INTENT TO KILL*

Defendant contends there is insufficient evidence to support his attempted murder conviction against Daffron (count 5) in that he did not possess the intent to kill.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

" ' " 'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " ' " (*People v. Virgo* (2013) 222 Cal.App.4th 788, 797.)

"[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted

16

with express malice.  That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill.  Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill."  (*People v. Smith* (2005) 37 Cal.4th 733, 742; see also *People v. Nelson* (2011) 51 Cal.4th 198, 212 ["Simply pointing [a] gun at [the victim] . . . is sufficient to support a finding of attempted murder"].)  "[I]ntent to kill often must be inferred from circumstantial evidence surrounding the crime."  (*People v. Canizales* (2019) 7 Cal.5th 591, 606 (*Canizales*).)

Daffron had confronted defendant earlier in the night asking him to leave the area.  Rather than leave, defendant reached toward his waistband and told him to get the "fuck" away from him.  Defendant did not leave the area and instead tried to get into Dukes with two handguns, loaded magazines and a knife.  Defendant was defiant when Daniels refused him entry because he was smoking.  When Daniels tried to get defendant to leave Dukes, he stabbed him.  Richards tried to help Daniels, and defendant stabbed him in the neck and back.  Defendant was defiant with the security guards and intended to hurt them.

Defendant was pinned to the ground when Daffron approached to help detain him.  Rather than give up, defendant deliberately reached into his waistband and pulled out a handgun.  The cellular telephone video clearly shows that defendant reached into his waistband and grabbed the gun.  Daffron testified that defendant pointed the gun at his

17

stomach. Daffron was able to grab defendant's gun and put his finger behind the trigger. This did not deter defendant and he pulled the trigger. This is strong circumstantial evidence that defendant intended to kill Daffron by pointing the gun at Daffron, who was in close range. He was only thwarted by Daffron being able to redirect the gun away from himself.

Defendant insists that the gun was accidentally fired. However, Daffron and Richards both testified that defendant pulled the trigger.

Defendant contends that he only had the direct intent to kill one staff member. "[W]here there are multiple possible victims of the attempted murder, the prosecution must establish that defendant intended to kill each victim for each count charged." (*People v. Virgo*, *supra*, 222 Cal.App.4th at p. 798.) Here, the evidence supports that defendant intended to kill Daffron. Defendant had a loaded weapon in his possession but chose to use the knife against Daniels and Richards. Daffron approached defendant and at this point, he pulled the gun out of his waistband. The jury could reasonably conclude that defendant had the intent to kill Daffron because he did not choose to use the gun until Daffron arrived, and because he pointed the gun at Daffron. Defendant's claim that he did not see Daffron is pure speculation. Daffron had his hand on the gun and defendant did not pull out the gun until Daffron arrived. It is inconceivable that defendant was unaware that Daffron was on top of him. Substantial evidence supports the jury finding that defendant had the intent to kill Daffron when he shot the gun.

18

## 2.    *PREMEDITATION*

Defendant also contends the evidence does not support that he committed the attempted murder of Daffron willfully, deliberately and with premeditation.

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' "  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)  "In assessing the sufficiency of evidence of premeditation and deliberation, courts often consider three factors discussed in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27[:]  planning, motive, and manner of killing.  [Citation.]  '*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive.  *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' "  (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 561.)

" 'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' "  (*People v. Lee* (2011) 51 Cal.4th 620, 636.)  A "preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse."  (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)  "[T]he appellate court does not substitute its judgment for that of the jury but affirms the verdict

19

if a rational trier of fact could find premeditation and deliberation beyond a reasonable doubt."  (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

Initially, there was evidence that defendant planned to enter Dukes and cause trouble that night.  Defendant was approached by Daffron and Childress when he was observed looking over the wall into the patio area of Dukes and refused to respond to questions from Richards.  Daffron advised defendant that he should leave and defendant responded to get the "fuck" away from him.  Defendant refused to leave.  It was at this point, defendant's counsel argued, that defendant armed himself with two handguns both with loaded magazines, and a knife to defend himself.  However, it was equally plausible that defendant armed himself, or was already armed as evidenced by his reaching for his waistband when Daffron initially confronted him, and this showed he planned to hurt someone at Dukes.[6]

His plan to cause trouble at Dukes was further evidenced by defendant's defiance in refusing to get rid of his cigarette when asked by Daniels.  The video in exhibit 4 shows defendant making no effort to comply with the demands of Daniels to take his cigarette outside.  Defendant just stared at Daniels and kept his cigarette.  He then pulled out his knife and fought with Daniels.  Daniels had no intention of leaving Dukes and was going to hurt the security guards who stood in his way.

---

[6] Defendant argues that arming himself did not show he planned to hurt Daffron or anyone else at Dukes.  This may be true if defendant was carrying one handgun but defendant had numerous magazines and two handguns which reasonably shows a plan to hurt those inside Dukes.

20

Defendant used the knife against Daniels and Richards, but it was taken from him. Defendant was on the ground. None of the security guards were beating him; they merely had him pinned to the ground and he could have given up. At this point, Daffron arrived to help Daniels and Richards. Defendant made a conscious choice to reach into his waistband for the hidden handgun and shoot at Daffron. The evidence establishes that he deliberately pulled the gun out and used it. This was not a rash or impulsive decision. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1127 [manner of killing showed premeditation and deliberation as defendant searched for additional knife after first knife broke].) Defendant had armed himself prior to entering Dukes, consciously pulled the gun from his waistband—when he could have just given up—and instead fired the gun. Despite defendant contending that he was only defending himself and used his weapons only after he was pushed by Daniels, the fact remains that he brought numerous weapons into Dukes after having been asked to leave and refused to leave even though he had the opportunity.

While there is no apparent evidence of motive, it does appear that defendant sought to enter Dukes to hurt those inside. Defendant had been outside Dukes looking into the patio area and ignored any inquiries as to what he was doing. He attempted to bring two handguns and loaded magazines into Dukes, which reasonably could be interpreted as he intended to hurt whoever was inside Dukes that night.

Defendant's premeditation and deliberation that he specifically intended to kill Daffron is evidenced by the fact that he had multiple opportunities to pull out his gun and fire at the security guards but waited until the knife was taken from him and Daffron was

21

involved. During the initial encounter with Daniels, defendant's hands were free and he could have pulled his gun on Daniels. Defendant instead pulled the knife out and used that to assault Daniels. The cellular telephone video shows that there was a time that defendant was standing with the security guards and his hands were not being held. At that point, defendant could have pulled the gun on all of them, but chose not to use the gun. It was not until he was pinned to the ground that he reached into his waistband and pulled out the gun. This was when Daffron arrived to assist Richards and Daniels. Once he pulled the gun from his waistband, he pointed it at Daffron's stomach and shot the gun. This was further evidence of premeditation and deliberation.

The evidence is sufficient to sustain the jury's finding of premeditation and deliberation in the attempted murder of Daffron.

### 3. *ASSAULT WITH A FIREARM*

Defendant contends the evidence does not support the true finding by the jury that defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), in the commission of the attempted murder of Daffron.

"[A] person who, in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years." (§ 12022.53, subd. (c).)[7] "Whether defendant used a firearm in the commission of an enumerated offense is for the trier of fact to decide. [Citation.] We review the sufficiency of the evidence to

---

[7] These felonies include attempted murder. (§ 12022.53, subds. (a)(1) & (a)(18)).

support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1058.)

Here, Daffron's testimony supports that defendant personally and intentionally discharged his firearm during the commission of the attempted murder of Daffron. Daffron testified that defendant pulled out the gun from his waistband and pointed it at Daffron's stomach. Daffron tried to grab the gun and was able to get his finger behind the trigger. At that point, defendant pulled the trigger, snapping Daffron's finger in half. It is inconceivable that Daffron could have pulled the trigger that broke his own finger, and defendant was the only other person holding the gun. Further, Richards testified that he observed defendant pull the trigger.[8]

Based on this evidence, the jury could reasonably conclude that defendant personally and intentionally discharged the firearm during the commission of the attempted murder of Daffron.

---

[8] Defendant claims that Richards testified he never saw defendant pull the trigger. However, he was asked on direct examination, "At this point did you see him pull the trigger?" Richards responded, "Yes." Later, Richards, on cross-examination, confirmed that when he grabbed defendant's wrist, the gun went off. He was asked, "Did you see his finger pull the trigger?" Richards stated, "I did not see it." Richards also testified that the gun went off while he held defendant's wrist and Richards did not pull the trigger. From this evidence, coupled with the testimony from Daffron, the jury could reasonably conclude that defendant pulled the trigger.

### B.   COUNT 2:  DANIELS

Defendant further contends that his conviction for assault with a semiautomatic firearm on Daniels is not supported by substantial evidence.  He insists that there was no evidence that defendant pointed the gun at Daniels or in his direction.  The gun was pointed at the ground when it was fired.

" 'An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' "  (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 206, fn. omitted.)  "No specific intent to cause injury is required.  [Citation.]  Rather, the focus is on the 'offensive or dangerous character of defendant's conduct.' "  (*Id.* at p. 207.)  Firing a "gun in the vicinity of others has been found, . . . to be sufficient to justify a charge of assault."  (*Id.* at p. 208.)  "Because the gravamen of assault is the *likelihood* that defendant's action will result in a violent injury to another [citation], it follows that a victim of assault is one for whom such an injury was likely."  (*People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1355.)

Daniels was within four feet of defendant when the shot was fired.  Daffron was struggling with defendant when the gun was fired.  Daffron was able to direct the gun away from himself when defendant fired the gun.  Daffron believed that Daniels had been shot and testified the gun was fired in the general vicinity where Daniels was standing.  This evidence that Daniels was within four feet of defendant when he pulled the trigger on the gun, and Daffron testified that the gun was pointed in the general vicinity where Daniels was standing, is sufficient to support defendant's conviction of assault with a firearm on Daniels.

24

C.    COUNT 3:  RICHARDS

Defendant raises two claims as to his conviction for the attempted premeditated and deliberate murder of Richards in count 3.  He claims his conviction for the attempted murder of Richards must be reversed because the evidence fails to establish that he acted with the requisite intent to kill.  He further contends there was no evidence that the attempted murder of Richards was committed willfully, deliberately or with premeditation.

We have previously set forth the standards for reviewing a claim of insufficient evidence, for finding an intent to kill for attempted murder, and for premeditation and deliberation and rely on these authorities here.  In *People v. Avila* (2009) 46 Cal.4th 680, the California Supreme Court found substantial evidence that the defendant intended to kill the victim based solely on the evidence that the defendant made repeated attempts to stab the victim and succeeded in stabbing the victim in the arm and leg.  (*Id.* at pp. 701-702.)  The court also noted that "[T]he degree of the resulting injury is not dispositive of defendant's intent.  Indeed, defendant may properly be convicted of attempted murder when no injury results."  (*Id.* at p. 702.)

Here, the jury found defendant guilty of the attempted murder of Richards based on defendant stabbing him with the knife.  Initially, there was strong evidence that defendant intended to kill Richards when he stabbed him.  Richards joined Daniels in trying to subdue defendant.  When Richards arrived, defendant deliberately swung the knife numerous times at Richards and connected.  He stabbed Richards in the neck and

25

back.  Defendant only stopped when Richards and Daniels were able to pin him on the ground and were able to pry the knife from his hand.

Richards was treated at the hospital and required several stitches.  The wound to his back was concerning to the treating physician as it could have penetrated his lungs.  Ultrasound tests were performed to ensure the stab wound had not penetrated his lungs or heart.  The doctor also indicated that a stab wound to the neck was a concern as it could impact major arteries, which would be life-threatening.  Defendant's actions in violently swinging the knife at Richards and the resulting injuries to Richards were strong circumstantial evidence that he intended to kill Richards.

As for the finding of premeditation and deliberation, defendant had the knife in his hand starting with the altercation with Daniels.  He held onto the knife throughout the interaction with the security guards.  Defendant immediately swung the knife at Richards when he approached to help Daniels.  It was clear that defendant had the intent to use the knife against Richards, and that he planned to use the knife against anyone who tried to stop him.  Defendant could have stopped and walked away at any point during the altercation.  Defendant was standing away from the security guards in the parking lot.  He could have held his hands up or retreated.  Instead, he chose to swing the knife at Richards, resulting in him being stabbed in the neck and chest.  The jury could reasonably conclude that defendant acted with premeditation and deliberation in the commission of the attempted murder of Richards.

D.    INSTRUCTIONAL ERRORS

Defendant claims the trial court committed two instructional errors.  First, he claims the trial court erroneously instructed the jury on premeditation in the standard instruction CALCRIM No. 601, which was given without objection or request for modification.  He further insists that his conviction for the attempted murder of Daffron in count 5 must be reversed as the jury was instructed on an inapplicable kill zone theory of liability.

The parties discussed the instructions both on and off the record.  The prosecutor proposed that it would give CALCRIM No. 600 on attempted murder but would have to give it twice based on two separate victims.  The instruction would include a kill zone theory.  The prosecutor also indicated that it was requesting CALCRIM No. 601 on premeditation and deliberation.  No objection to either instruction was made by defendant.

1.    *CALCRIM No. 600*

The jury was instructed on attempted murder for counts 3 and 5.  Defendant only contests the instruction as to count 5, the attempted murder against Daffron.  Defendant contends that the kill zone instruction was inapplicable to the count involving Daffron because it was inapplicable based on the evidence presented in the case.[9]

The jury was instructed on attempted murder on count 5.  It instructed the jury, "To prove defendant is guilty of attempted murder, the People must prove that:  [¶]

---

[9]  He does not make the same claim as to the attempted murder of Richards recognizing that his conviction was based on defendant's use of the knife, not the gun.

27

1.  Defendant took at least one direct but ineffective step toward killing another person. [¶] AND [¶] 2. Defendant intended to kill that person."  The instruction also included a kill zone theory of liability as follows:  "A person may intend to kill a primary target and also a secondary target within a zone of fatal harm or 'kill zone.'  A 'kill zone' is an area in which defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.  [¶]  In order to convict defendant of attempted murder of [Daffron], the People must prove that defendant not only intended to kill [Daffron], but also either intended to kill [Daffron] or intended to kill everyone within the kill zone.  [¶] In determining whether defendant intended to kill [Daffron] the People must prove that (1) the only reasonable conclusion from defendant's use of lethal force is that defendant intended to create a kill zone; and (2) [Daffron], was located within the kill zone.  [¶]  In determining whether defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following:  [¶]  The type of weapon used; [¶] The number of shots fired; [¶] The distance between defendant [and] [Daffron]; [¶] The distance between [Daffron] and the primary target.  [¶]  If you have a reasonable doubt about whether defendant intended to kill [Daffron] or intended to kill [Daffron], by killing everyone in the kill zone, then you must find defendant not guilty of attempted murder of [Daffron]."[10]

"[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes:

---

[10]  The same instruction was given for Richards, with his name substituted for Daffron.

28

(1) the circumstances of defendant's attack on a primary target, including the type and extent of force defendant used, are such that the only reasonable inference is that defendant intended to create a zone of fatal harm—that is, an area in which defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm.  Taken together, such evidence will support a finding that defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

"In determining defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between defendant and the alleged victims, and the proximity of the alleged victims to the primary target.  Evidence that defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at 607.)  It concluded that, "we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate." (*Ibid.*)

The People concede that the kill zone instruction given was erroneous citing to *People v. Mumin* (2023) 15 Cal.5th 176, 193-194, 204-205.  "The far more commonplace act of firing one or a few shots at a group may supply the actus reus for a number of crimes.  But, standing alone, it does not support a conclusion that the shooter intended to create a kill zone around the primary target in order to ensure that primary target will

29

die." (*Id.* at p. 193.) We agree with the parties that the evidence did not support the kill zone instruction in this case.

The erroneous instruction given to the jury did not prejudice defendant as beyond a reasonable doubt it did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Defendant insists that the giving of the instruction was prejudicial as the jury could find him guilty of the attempted murder of Daffron without a finding that he had the intent to kill Daffron.

A similar instruction was given in *People v. Tran* (2018) 20 Cal.App.5th 567. In *Tran*, the instruction named the same victim, Roger James, as the primary and secondary target. (*Id.* at p. 567.) The appellate court found that such instruction could not have possibly prejudiced the defendant. "[I]t could not possibly have prejudiced appellant because it expressly required the jury to find he harbored the intent to kill James in order to convict him of that offense. In fact, the kill zone instruction was repetitive in terms of conveying that requirement in that it required the jury to find 'defendant not only intended to kill Roger James,' but also that he 'intended to kill Roger James or intended to kill Roger James by killing everyone in the kill zone[.]' Either way, appellant could not have been found guilty of a kill zone attempted murder under this instruction unless the jury found he intended to kill James. Therefore, any error in the wording of the kill zone instruction was patently harmless. There is no basis to disturb appellant's conviction for attempting to murder James." (*Ibid.*)

30

Here, the jury was instructed the same as in *Tran* in that Daffron was named both the primary and secondary target. The jury necessarily had to conclude that defendant had the intent to kill Daffron.

Moreover, the jury necessarily did not rely on the kill zone theory in convicting defendant of the murder of Daffron. As noted, the jury found defendant was guilty of the attempted murder of Richards based on the use of the knife only. As such, it necessarily found defendant guilty of the attempted murder of Daffron based on the firing of the gun and must have concluded that defendant had the intent to kill Daffron when he fired the gun. As such, any conceivable error in instructing the jury with the kill zone instruction was harmless beyond a reasonable doubt.

### 2.    *CALCRIM NO. 601*

The jury was instructed with premeditation and deliberation for counts 3 and 5 in CALCRIM No. 601. It was instructed, "Defendant acted willfully if he intended to kill when he acted. Defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. *Defendant acted with premeditation if he decided to kill before completing the acts of attempted murder.* [¶] The length of time a person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold calculated decision to kill could be reached

31

quickly. The test is the extent of the reflection, not the length of time." (Italics added.) Defendant contends the italicized portion of the instruction inaccurately defines premeditation.

Defendant did not object to the standard instruction given by the trial court. "Defendant . . . may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete.' [Citations.] Defendant's failure to . . . object to the proposed instruction . . . forfeits his claim on appeal." (*People v. Valdez* (2004) 32 Cal.4th 73, 113.) We need not consider this claim on appeal.

### E. OFFICER TESTIMONY

Defendant contends the trial court committed reversible error when it allowed Officers Karotz and Valenzuela to narrate the surveillance video and cellular telephone video as their testimony went beyond drawing reasonable inferences and, in fact, interpreted the facts for the jury. The admission of the evidence violated both his state and federal constitutional rights.

#### 1. *ADDITIONAL FACTUAL BACKGROUND*

During Officer Karotz's testimony, the prosecutor played the video of the confrontation between Daniels and defendant. He was asked about the contact between defendant and Daniels. Officer Karotz explained that he believed Dukes had a policy of no smoking inside their premises. Officer Karotz began to evaluate defendant's body language but defendant's counsel objected as speculation, which was sustained. Officer Karotz indicated that based on defendant having his hand in his pocket, he would think that defendant had a weapon in his pocket and was preparing to arm himself.

32

Defendant's relevance objection was overruled. Officer Karotz would have demanded that defendant remove his hand from his pocket.

Officer Karotz was then asked whether he could observe defendant still with his hand in his pocket in the video. Defendant's counsel objected that the video could speak for itself. The trial court overruled the objection. Officer Karotz then testified that it appeared he was grasping something. Officer Karotz was then asked to view the photographs taken from the video. He reviewed exhibit 71 and noted that it showed defendant with his hand around a black object. Exhibit 72 exhibited the blade of the knife extending out from his fist. Officer Karotz was also shown exhibit 74 and asked about defendant's body language. A relevance objection was overruled. Officer Karotz indicated that based on the photograph and video, defendant could be seen stabbing the security guard. Officer Karotz also stated that there was a flash of the knife blade that could be seen in the video.

Officer Karotz was also shown exhibit 5, which was the video depicting the outside walkway leading to the front door of Dukes. The video showed defendant walking into Dukes behind a security guard. Once again, defendant could be seen swinging the knife.

Officer Valenzuela described the cellular telephone video to the jury. She stated the video showed the security guards attempting to get defendant to the ground. It did not appear that defendant was cooperating with the security guards. She observed defendant swinging his hand towards the security guards. The object in his hand appeared to be a knife. Officer Valenzuela was asked, "In this instance, the security

33

guard closest to the individual on the ground, does it appear they are striking the individual?" Defense counsel objected on the grounds the video stands for itself, speculation and irrelevant. The trial court responded, "I think this witness could opine." She went on to describe that the security guard was directly above defendant with his hands on defendant. He had an open palm. She also was shown exhibit 78, which was a still photograph from the video. The knife could clearly be seen in defendant's hand. It appeared in the video that defendant was swinging his hand toward the security guard and made contact. It appeared the security guards were trying to defend themselves and one of them was trying to hold down defendant.

Officer Valenzuela was asked if it appeared that the security guards were trying to stop the altercation. An objection on speculation and irrelevance grounds was sustained. Officer Valenzuela then testified she saw one of the security guards pick up a handgun from the ground. This was prior to a gunshot being heard in the cellular telephone video. During the video, defendant never put his hands up to signal the officers that they should stop.

2.     *ANALYSIS*

The People have argued that defendant waived this issue on appeal by failing to object on the same grounds in the lower court as raised on appeal. The People also contend that testimony by the officers was proper lay witness opinion testimony that was helpful to the jury. We need not consider these claims as we find that the admission of the evidence was not prejudicial to defendant as there is no reasonable probability of a

34

more favorable outcome had the testimony been excluded.  (*People v. De Hoyos* (2013) 57 Cal.4th 79, 131; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, the jury was shown the videos in exhibits 3, 4 and 5 several times.  They also viewed the still photographs from the videos.  They were presented with testimony from percipient witnesses including the security guards and Dubski, who was a patron at Dukes, detailing the events that appeared in the videos.  Dubski repeatedly testified that defendant never backed away from the security guards nor tried to stop the altercation.  Defendant admits that the jury was more than capable of viewing the videos themselves and did not need additional testimony from the officers.  Defendant merely speculates that the jury was "likely to defer" to the officers' opinions about what was shown in the videos rather than their own assessment.  There is nothing to support this speculation.  Moreover, the testimony of the officers properly described what occurred in the videos and provided nothing more than what the jury already knew based on their independent view of the videos.

Defendant also claims exhibit 3 was grainy and hard to see.  However, there were still photographs taken that showed the video more clearly.  The jury could reasonably view the videos and reach its own conclusions as to what was depicted in the videos.  Defendant also contends that the testimony infringed on his defense of self-defense, but the jury on its own could see that defendant had opportunities to end the altercation but chose to continue to fight with the security guards.  Further, they could rely on the testimony of Dubski that defendant never retreated.  Any conceivable error in the admission of the officers' testimony was harmless.

F.      *PITCHESS*

Finally, defendant contends this court should conduct an independent *Pitchess* review of the records the trial court reviewed for Riverside Police Officers Glover, McMillan and Karotz.  The People do not object.

On June 29, 2021, defendant brought a motion for discovery of information pursuant to *Pitchess.*  Defendant sought information pertaining to Officers McMillan, Glover and Karotz.  Defendant sought any information of prior violence, dishonesty, improper arrests and any other types of wrongful conduct by the officers.  Defendant insisted the evidence was relevant as the officers fabricated police reports, engaged in dishonesty and planted evidence in the instant case.  Attorneys on behalf of the City of Riverside, and who represented the officers, filed opposition.

The trial court addressed the *Pitchess* motion on August 10, 2021.  The trial court found that there was good cause for an in camera review of records from the prior five years for evidence of fabrication of false police reports, false reports, planting evidence, conduct involving dishonesty, conviction involving moral turpitude, conduct involving moral turpitude, complaints by residents of fabrication of false reports and planting of false evidence.  No other records, such as use of excessive force, were relevant.  The trial court conducted an in camera review of the records provided by the City of Riverside.  After its review, the trial court found there was no discoverable information to turn over to the defense.  It sealed the records that it had reviewed.

Under *Pitchess*, "a criminal defendant has a limited right to discovery of peace officer personnel records in order to ensure 'a fair trial and an intelligent defense in light

36

of all relevant and reasonably accessible information.' " (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1037, fn. 3, overruled on other grounds in *Facebook Inc. v. Superior Court (Touchstone)* (2020) 10 Cal.5th 329.) "A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion." (*People v. Hughes* (2002) 27 Cal.4th 287, 330.)

We have independently reviewed the sealed transcript of the hearing and the records that the trial court reviewed in camera. We find that the trial court properly concluded that there was no discoverable information.

## DISPOSITION

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                          
Acting P. J.

We concur:

CODRINGTON                
J.

RAPHAEL                      
J.